# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:10-CR-00505 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **JOINT SENTENCING MEMORANDUM** |
| | ) | **FOR DEFENDANTS THOMAS J.** |
| THOMAS J. STRICKER, et al. | ) | **STRICKER, GREGORY T. STRICKER,** |
| | ) | **AND STRICKER REFINISHING** |
| Defendants. | ) | **COMPANY, INC.** |

The attached Joint Sentencing Memorandum for Defendants Thomas J. Stricker, Gregory

T. Stricker, and Stricker Refinishing Company, Inc. is submitted pursuant to Crim. R. 32(i) and

18 U.S.C. §3553.

Respectfully submitted,

/s/ John R. Mitchell
MICHAEL L. HARDY
Ohio Bar Reg. No. 0011717
JOHN R. MITCHELL
Ohio Bar Reg. No. 0066759
Mike.Hardy@ThompsonHine.com
John.Mitchell@ThompsonHine.com
Thompson Hine, LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
(216) 566-5500

*Attorneys for Gregory T. Stricker and*
*Stricker Refinishing Company, Inc.*

/s/ John F. McCaffrey
JOHN F. MCCAFFREY
Ohio Bar Reg. No. 0039486
jmccaffrey@mmlitigation.com
McLAUGHLIN & McCAFFREY LLP
1111 Superior Avenue
Eaton Center, Suite 1350
Cleveland, Ohio 44114-2500

*Attorney for Thomas J. Stricker*

# TABLE OF CONTENTS

Table of Contents...................................................................................................................i-ii

I.  Introduction ...................................................................................................................1

II. Greg Stricker's Background, Family,
    Charitable Endeavors, And Legal History ....................................................................1

    1.   Greg's Background And Education.......................................................................1

    2.   Greg's Family ......................................................................................................2

    3.   Greg's Civic Activities and Community Involvement ...........................................2

    4.   Greg's Previous Criminal History .......................................................................3

III. Tom Stricker's Background, Family, and Civic Activities ...........................................3

    1.   Tom's Background and Education.........................................................................3

    2.   Tom's Family ......................................................................................................4

    3.   Tom's Civic Activities and Community Involvement ...........................................4

    4.   Tom Has No Relevant Criminal History...............................................................5

IV. Stricker Refinishing Company's History and Current
    Operations, and Greg And Tom's Roles in the Company ..............................................5

    1.   Stricker Refinishing's History..............................................................................5

    2.   The Company's Operations ..................................................................................6

    3.   The Company's Workforce...................................................................................6

         a.   Greg Stricker's Work Duties and Job Responsibilities..................................6

         b.   Tom Stricker's Work Duties and Job Responsibilities..................................7

         c.   Other Employees...........................................................................................7

V.  Nature of the Offense/Background on the crime...........................................................8

    1.   The Offense Conduct Outlined in the Information .................................................8

i

| | 2. | Dorothy Stricker's Illness and Death Impacted Greg and Tom's Oversight of Their Business | 9 |
|---|---|---|---|
| | 3. | Greg and Tom's Reaction tot the Search of the Company | 9 |
| | 4. | Stricker Refinishing's Systemic Changes to is Pretreatment System and Subsequent Regulatory Inspections | 9 |
| **VI.** | | **Guidelines Calculations** | 10 |
| | 1. | Greg and Tom's Sentencing Guidelines Calculations | 10 |
| | | a. Adjusted Offense Level | 10 |
| | | b. Effect of the illegal Discharges | 10 |
| | 2. | Greg Should Receive a Downward Departure for his Minor Role in the Offense Pursuant to U.S.S.G. § 3B1.2 | 10 |
| | 3. | Greg and Tom Should Receive a Downward Departure Pursuant to U.S.S.G. § 5K2.0 As the Loss Of Business And Hardship Imposed On Employees Are Permissible Considerations | 11 |
| | 4. | 18 U.S.C. § 3553 Factors Support a Variance From a Sentence of Incarceration | 12 |
| | 5. | The Company's Suggested Sentence Should be Imposed | 14 |
| **VIII.** | | **Conclusion** | 14 |
| **Appendix A** | | | 17 |
| **Appendix B** | | | 23 |
| **Appendix C** | | | 26 |
| **Appendix D** | | | 27 |

## I.    Introduction

The Presentence Investigative Reports capture much of the information that this Court requires to impose a sentence on Gregory T. Stricker ("Greg"), Thomas J. Stricker ("Tom"), and Stricker Refinishing Company, Inc. ("Stricker Refinishing" or "the Company"). The conduct forming the basis of their pleas is the same, and Greg, Tom, and Stricker Refinishing have accepted responsibility for their crimes. Still, there are additional factors which the Court should consider under 18 U.S.C. §3553 and the U.S. Sentencing Guidelines.

Since August 2007, Greg and Tom have done everything they possibly could to atone for their conduct, including taking extraordinary measures to insure that their Company never again improperly discharges material into Cleveland's sewers. The Company has invested over $100,000 in improving its operations and training its employees. Greg and Tom know that this investment was absolutely necessary to insure that they ran their Company in a manner that complied with all federal, state and local environmental requirements.

It is important to Tom, Greg, and the employees of the Company that this Court appreciate that their sentences will have a profound hardship on the Company and its employees. Both Greg and Tom are essential to the daily operation of the Company. As detailed below and in the presentence investigative reports, they perform separate, but equally important, roles in the Company's operations. Simply put, without their day-to-day management and participation, the Company will not survive. Greg and Tom respectfully request that this Court adopt a sentence that does not require a term of actual confinement of imprisonment.

The Company's plea agreement suggests a two-year period of probation, a fine of $30,000 and a $10,000 donation to Ducks Unlimited, and it respectfully requests that this Court impose that sentence.

## II.   Greg Stricker's Background, Family, Charitable Endeavors, And Legal History

### 1.    Greg's Background And Education

Greg was born on January 23, 1959, and he was the sixth of seven children. The family lived in East Cleveland until 1969, then moved to South Euclid when Greg was 10. Greg, by his own admission, had a wonderful childhood. His family was very close, and his parents were very loving and supportive towards all of the Stricker children.

Greg attended Christ the King and St. Gregory the Great elementary schools. He attended Cathedral Latin for high school and graduated in 1977. While in high school, Greg played football. Greg attended night school at both Cuyahoga Community College and Cleveland State University, earning a liberal arts associate's degree.

The Strickers have a long history in the plating industry. Greg and Tom's father, Robert, worked in the plating industry and was one of the owners of Standard Plating. After high school, Greg worked at Standard Plating from 1977 to 1983, then worked for Precious Metals, another plating company, for a year.

After working at the family business for 5 years and at Precious Metals for a year, Greg realized that his vision of how a plating business should run did not mesh with the services provided by his family's plating business. Standard Plating and Precious Metals specialized in residential plating where as Greg saw a brighter future in industrial and commercial plating operations. After consulting with Tom, they started Stricker Refinishing Company in 1984.

   2.   *Greg's Family*

In 1983, Greg met his wife Jane, and they were married on November 23rd, 1984. The couple lived in Cleveland Heights for five years, and then moved to Chagrin Falls in 1989. Greg and Jane have 4 daughters: Sara, 24; Jane, 21; Judith, 20; and Megan, 15. Greg worked hard to insure that his wife and daughters had a happy home life and dedicated himself to being a good father. He was very involved in their lives, coaching them in baseball and basketball.

Greg and Jane are extremely proud of their daughters. The oldest daughter, Sara, graduated from the University of Dayton with a degree in Marketing and Economics and now works for Anheiser Busch. Jane is a Senior at St. Louis University and will graduate with a degree in Speech Pathology. She plans on attending graduate school in the Fall of 2011. Judith is a Junior at the University of Pittsburg and is studying to become a nurse. Megan, the youngest daughter, is Sophomore at Chagrin Falls High School. All of Greg and Jane's daughters are members of the National Honor Society because of their scholastic achievements. They also played multiple sports while in high school. David Axner, the former superintendent of the Chagrin Falls School District, explained that "[Greg] was a very involved parent and in many ways, served as a role model for other parents in the district."[1]

   3.   *Greg's Civic Activities And Community Involvement*

Greg also dedicated himself to making the community around him a better place. When he was younger, he coached boys baseball and basketball when he lived in Cleveland Heights.

Upon moving to Chagrin Falls, Greg increased his community contributions. He was one of the founders of the Chagrin Falls Dad's Club ("Dad's Club"). Founded in 1996, the Dads' Club is a non-profit corporation with two primary goals: to improve the educational, recreational, and social opportunities available to the children of the Chagrin Falls School District, and to promote good fellowship among the Dad's Club membership and the Chagrin Falls community. The Dad's Club is one of the primary supporters of the Chagrin Falls School District, and it has raised over $750,000 for the benefit of all Chagrin Falls students.

---

[1] Please see January 25, 2011 correspondence of David E. Axner, Superintendent of Dublin City Schools, attached as Exhibit A.

Greg is very involved in the Dad's Club. He served in a variety of ways, volunteering as the club's unofficial CEO when the organization was in its infancy. He was instrumental in the some of the Dad's Club's largest projects: the construction of a pavilion at the local youth sports field, the bathroom renovations at Harris field, the renovation and reconstruction of the playgrounds at Gurney Elementary School, obtaining funding for numerous teacher education projects, and other projects. He has been universally praised for his leadership, the achievements of the organization, and remains active in the organization today. Mr. Axner also noted "[h]e was instrumental in creating the CF Dads's Club, which has a * * * purpose of helping the school district accomplish projects and create programs to help kids. * * * He devoted countless hours of his time to raising needed funds and was personally involved in the details, making sure things were done right."

In addition to the Dad's Club, Greg regularly volunteers at his parish, St. Joan of Arc. He and Jane were active in parish activities, serving on the St. Joan of Arc Casino Night and raising over $50,000 for the parish from this event alone. He has readily volunteered his time, and his money to help St. Joan of Arc meet its parochial and financial obligations. Greg served on the Board of the Chagrin Athletic Organization ("CAA"), the governing organization for all youth sports activities within Chagrin Falls.[2]

### 4.    Greg's Previous Criminal History

The items identified in paragraphs 34-40 identify Greg's previous criminal history. These items are not representative of Greg's true character and the respect in which he is held by the law enforcement figures that know him best. James T. Brosius, the Chief of Police of Chagrin Falls Village writes: "I know Greg as a man of character and integrity who is very committed to serving his community in any capacity that is asked of him. He is well respected and admired by those who are associated with him. I have nothing but the highest regard for Greg Stricker, and am personally aware of the respect and consideration he has for the law and those who are charged with enforcing the law."[3]

The most recent of these offenses was 1995, and the remoteness of all of these offenses should have no impact on this Court's determination of the appropriate sentence for Greg.

### III.    Tom Stricker's Background, Family, and Civic Activities

### 1.    Tom's Background And Education

Tom Stricker was born on April 18, 1960 and is a year younger than Greg. He was the seventh of seven children. Like his brother, Tom also had an idyllic childhood. Tom also attended Christ the King and St. Gregory the Great grade schools and graduated from Cathedral Latin High School in 1978. While in high school, he played football, tennis, and golf.

---

[2] *See* November 16, 2010 correspondence of Dennis M. Coyne, attached as Exhibit B.
[3] *See* February 1, 2011 correspondence of James T. Brosius, Chief of Police, attached as Exhibit C. *See also* February 21, 2011 correspondence of Gary J. Leppla attached as Exhibit D.

Tom attended the University of Dayton, graduating in 1982 with degrees in management and marketing. He worked for a period of time as the business manager at Rick Case Motors, then founded Stricker Refinishing with his brother in 1984.

## 2. Tom's Family

Tom met his wife Beth, in college. They were married on August 23, 1986. The couple has 4 sons: Ryan, 23; Brad, 21; Sean, 19; and Kyle, 17. All of their children are athletic, playing football, baseball, and basketball. Tom is very involved in his sons' lives. He has coached his sons' baseball, basketball and football teams. Between 1994 and 2007, Tom coached at least two youth sports a year. Many of his coaching duties required travel, but Tom readily honored this commitment to his children.

Tom and Beth have enjoyed watching their sons grow into men. Ryan is a Senior, seeking his bachelor's degree from Notre Dame College in Political Science with an emphasis in criminal justice. Brad is a Junior at the University of Dayton. He is seeking a degree in Sport's Management and will graduate MBA-ready. Sean also attends the University of Dayton and is a Sophomore. He is seeking a degree in Sport's Management and will graduate MBA-ready as well. Kyle is a Junior at Notre Dame Cathedral Latin School and will graduate in the Spring of 2012. Because of their hard work and academics, Ryan and Brad were able to earn partial scholarships to their respective colleges.

Tom's friends appreciate his commitment to his children and how he tried to raise them to be responsible adults. Fred DiSanto, the CEO of Ancora (an investment advisory firm), writes "* * * Tom is all about family and * * * family is the most important thing in his life * * *. Tom has instilled in his children the same core values that he leads his life with, Trust, Loyalty, Honesty, Generosity, and Integrity."[4]

## 3. Tom's Civic Activities And Community Involvement

Tom has dedicated a tremendous amount of time, energy and money to charitable organizations. Both Tom and Beth are very active in their parish community at St. Paschal Baylon in Highland Heights. They have volunteered on numerous committees and donated over $50,000 to the parish. Tom co-chaired the $4.5 million Capital Campaign and he and Beth donated $35,000 to give the campaign a strong start. Tom and Beth also contributed significant amounts of time and energy to Notre Dame Cathedral Latin School. Tom has served on the Main Event fundraising committee, and has been an Athletic Booster member for eight years. They have donated over $40,000 to the school. Tom and Beth have also participated in the Dorothy Day Dinners at Christ the King Parish to provide food to the poor (including sponsoring one entire dinner).

Tom's volunteer activities are not limited to his parish. He served on the Board of Trustees of the Cathedral Latin Alumni association. He also served on the Amateur Athletic Union ("AAU") Golf Committee. His volunteer efforts as a coach genuinely effected the lives of countless young people. Dr. Roger Goudy, Superintendent of the Madison Local School

---

[4] *See* January 25, 2011 correspondence of Fred DiSanto, Chief Executive Officer of Ancora, attached as Exhibit E.

District, noted "[t]here are hundreds of kids out there that are better citizens and on the right path because of Tom Stricker."[5]

When their older sister Judy died of cancer in 1985, Greg and Tom organized the Judy Stricker Memorial Golf Outing. Greg and Tom also raised over $80,000 for the pediatric unit at Rainbow Babies and Childrens Hospital ("Rainbow Babies") that is part of the University Hospitals network. They ran the golf outing for 10 years, donating their time and energy to raise money in their sister's name. The proceeds from the fundraiser were donated to Rainbow Babies in appreciation of the care that Brad Stricker received when battling a life-threatening illness in his infancy.

### 4. Tom Has No Relevant Criminal History

Other than the two events noted in paragraphs 34 and 36 of Tom's presentence investigation report, Tom has no criminal history which impacts his potential sentence or the conduct at issue. Tom has the support and admiration of a number of officials who have dedicated their lives to upholding our nations' laws. Former F.B.I. Assistant Special Agent In Charge of the Cleveland Division Derek Siegle writes: "[Tom] is a very honest and forthright person. * * * After 23 years in the F.B.I. and my experience with dealing with people, * * * I truly believe Tom is of the highest character."[6] David Joyce, the Geauga County Prosecuting Attorney, noted that "[t]his is a man who is known in his community for being honest, caring, and giving. The emotional and psychological strain as well as the public humiliation involved to date is a sentence in itself. * * * Whatever occurred that brought him before you is an aberration in what one would consider an exemplary life."[7]

### IV. Stricker Refinishing Company's History And Current Operations, And Greg And Tom's Roles In The Company.

### 1. Stricker Refinishing's History

Greg and Tom founded Stricker Refinishing. Their vision for their company differed from other plating operations. They saw a larger market in the industrial and commercial plating process as opposed to the residential plating that comprised the core business of Standard Plating and Precious Metals. With this vision, Greg and Tom started their business at its current location, 2060 Hamilton Avenue, Cleveland, Ohio in 1984.

Stricker Refinishing initially started as a two-person operation that specialized in tin plating. Through Greg and Tom's hard work, the Company slowly grew, adding additional plating operations. The Company began silver plating in the mid to late 1980s, adding nickle, gold and other plating services in response to customer demands.

---

[5] See January 24, 2011 correspondence of Dr. Roger J. Goudy, Superintendent of Madison Local School District, attached as Exhibit F.
[6] See correspondence of Derek M. Siegle, Director, Ohio High Intensity Drug Trafficking Area, attached as Exhibit G. See also February 21, 2011 correspondence of Gary J. Leppla attached as Exhibit D.
[7]See correspondence of February 8, 2011 of David P. Joyce, Geauga County Prosecuting Attorney, attached as Exhibit H. See also February 3, 2011 correspondence of Thomas G. Lobe, attached as Exhibit I.

Because of their hard work, outstanding products and superior customer service, the Company has grown to its present size. It now generates over $2 million in annual sales and employs 13 full and part-time employees. Richard Lang noted "Greg and Tom Stricker are the type of people that are building Cleveland and the surrounding area. They hire local people, helping to contribute to the local economy. They call on many other Cleveland area companies to help with their needs and processes."[8]

### 2. The Company's Operations

Stricker Refinishing specializes in plating products for use in industrial applications. Its customers rely on its highly-specialized capabilities to fulfill orders that require specific military or customer specifications and involve measurements that must be accurate within microinches. Many of Stricker Refinishing's products must comply with the European Restrictions of the Use of Certain Hazardous Substances ("ROHS").

The Company specializes in plating services that employ different plating techniques (*e.g.* large and small volume barrel plating, large and small volume rack plating, plating over aluminum and stainless steel, masking and specialty plating, selective silver plating). This work is highly-specialized, and Stricker Refinishing has an in-house laboratory that it uses to test the quality of its work.

The Company has an excellent reputation for reliability and quality, and there are few vendors capable of replacing the plating services Stricker Refinishing supplies to its industrial and military customers. John Jeffreys, Purchasing Manager for Watteredge, Inc. commented on Stricker Refinishing's "quality conscious" attitude, noting that Greg and Tom's involvement in the Company gives Watteredge, Inc. a "very high level of confidence that the plating functions they perform are correct and to specification."[9]

### 3. The Company's Workforce

The plating business requires a significant amount of specialized knowledge, training, and attention to detail. Greg and Tom, through out the development of their business, have carved out separate and, yet equally important, roles in the Company. As Mr. Jeffreys noted "At every level of the company they are involved. This is not uncommon in small business, * * * but in Greg and Tom's case its much different. They are involved daily in the very heartbeat of this company, the production floor, working side by side with their employees."[10]

#### a. Greg Stricker's Work Duties And Job Responsibilities

Greg is the President of the Company. On a daily basis, he serves as the sales manager and shop foreman and is responsible for the front end of the plating process. His sales responsibilities require his direct interaction with the Company's customers, and he quotes and prices each of the

---

[8] *See* March 8, 2008 correspondence of Richard Lang, Lang Equipment Company, attached as Exhibit J.
[9] *See* February 4, 2011 correspondence of John H. Jeffreys, Purchasing Manager for Watteredge, Inc. attached as Exhibit K.
[10] *Id.*

Company's plating jobs. He is also responsible for customer service, customer invoicing, and accounts receivable.[11]

Greg's responsibilities as shop foreman require his daily presence at the Company. He engineers and designs the plating racks, and determines which plating procedures are appropriate for each project. Each plating job has its own specific requirements and variances, and Greg instructs the workers on the plating line as to which plating procedures should be employed for a particular job. He also supervises their activities throughout the process. Greg meets with the plating employees each morning, assigning their work-related tasks associated with each plating project.

        b.    Tom Stricker's Work Duties And Job Responsibilities

Tom is the Company's Vice-President, and his duties are separate and distinct from Greg's duties. Tom is responsible for the back-end of the plating process. After Greg gets a project rolling, Tom makes sure that the job is performed correctly. On a daily basis, Tom must analyze the three electroless nickel baths along with other plating baths used in its plating operations, adding or reducing the metal content as appropriate. Many of his duties involve inspection and quality control. He is solely responsible for the Company's ISO 9000 quality management system.[12] The importance of this responsibility cannot be overstated as many of Stricker Refinishing's customers require that the Company be ISO 9000 compliant, and, without Tom, the Company would be unable to maintain this certification.

Another of Tom's vital responsibilities involves supervising the Company's waste treatment system. He performs the daily maintenance on the wastewater treatment system, including monitoring its performance and changing used membranes and filters. Tom works with the many consultants and vendors that the Company hired to correct its system after August 2007 (see Appendices A, B, C, and D).

Tom also is responsible for packaging, customer pick-ups, and shipping. He oversees the Company's billing, accounts payable, and Tom performs annual reviews with each of the Company employees with regard to their job performance. He works with the computer consultants on updating computer programs. He also supervises the employee payroll, time-cards, vacation, and sick days.

Understandably, the Company's employees are apprehensive about their future. They understand Greg and Tom's importance to the Company and wonder how the Company will continue without their presence.

        c.    Other Employees

Stricker Refinishing has a positive work environment. The employees are paid competitive wages and a generous benefit package. Greg and Tom have been generous in assisting their employees, lending money to them for the purchase of their homes, to learn English, purchase

---

[11] Please see March 18, 2011 Affidavit of Elie Nadar, attached as Exhibit L.
[12] Id.

their first car, meet medical obligations, and realize the American dream.[13] In contrast to the high turnover experienced in many plating shops, Stricker Refinishing's work force is stable and many of its employees have been with the Company for numerous years. As proof, it should be noted that the Government's confidential informant continued to work at the Company for more than two and a half years after the search warrant was executed in August 2007. His cooperation was immediately known by Tom and Greg. They made no attempt to take any adverse action against him, and the informant remained on the Company payroll until he was able to secure a position with the Cleveland Police Department.

## V.     Nature of the Offense/Background on the crime

### 1.     The Offense Conduct Outlined In The Information

Prior to the summer of 2007, Stricker Refinishing never had any issues with the federal, state or local environmental officials or any law enforcement agency. The Company used a pretreatment system that was more than capable of managing the Company's discharges for the preceding 23 years, and there were no issues associated with its use.

In early 2007, Stricker Refinishing installed a pretreatment system designed by Water and Wastewater Equipment ("WWE") as the Company began its electroless plating operations. This new system was not required by NEORSD or any other environmental agency, but the Company thought it would assist their compliance with federal, state and NEORSD requirements as it began to perform new plating operations. The Company encountered numerous problems during the installation and early operation of the system designed by WWE. The primary problem was that the filters installed in the system did not work properly because of a design flaw. The filters easily clogged, causing the entire pretreatment system to back-up. When the system backed-up, the entire facility was at risk for flooding. When flooding occurred, the Company had to cease operations and perform a time-intensive and expensive clean up.

To avoid a system back up and the resulting flooding, a by-pass valve was installed in violation of the Company's permit with the NEORSD. The by-pass valve enabled waste waters to avoid the defective filters, allowing the Company to continue operations when the filters clogged or when their was a risk of a system back up until the problem could be corrected. The by-pass was used on 3 occasions, and elevated amounts of metals were discharged into Cleveland's sewers. Other times, process waste waters were simply pH treated to avoid interaction with the defective system, resulting in elevated levels of zinc and copper being discharged into Cleveland's sewers. The elevated levels came from the metals used in the 50 gallon dead rinse tanks. While elevated levels, the discharges involved can be measured in hundreds of gallons, rather than thousands or millions of gallons associated with a large environmental disaster.

There is no dispute that this was the wrong way to approach this problem, and the failure to correct the problems associated with the WWE-designed system are at the root of the charges in the Information.

---

[13] *Id.*

8

### 2. Dorothy Stricker's Illness And Death Impacted Greg And Tom's Oversight Of Their Business

Throughout the summer of 2007, Greg and Tom were dealing with the impending death of their mother, Dorothy Stricker, from cancer. They spent countless days and nights by her bedside while she was in hospice until her death on August 8, 2007, less than 3 weeks prior to the execution of the search warrant. As a result of their mother's lengthy illness, they spent less time managing their business than they had in the past because they had to divide their time between being with their Mother and being at work. Some days only one of them could be at work. This lack of oversight and the problems caused by the WWE-designed pretreatment system contributed to the offense conduct.

### 3. Greg And Tom's Reaction To The Search Of The Company

Greg and Tom have always considered themselves good citizens and law-abiding individuals. They have taught their children to respect the law and to behave appropriately. When the Company was searched in August 2007, it became apparent to both Greg and Tom that their behavior did not reflect the manner in which they viewed themselves, and the effects of their neglect of the problems with the WWE-designed pretreatment system and the short-cuts they had taken became readily apparent.

Greg and Tom recognized that they had broken the law, and they knew it was incumbent upon them to fix the problems with their system, pay more attention to their business and the actions of their employees, and make sure that Stricker Refinishing was run in compliance with all federal, state and local governmental regulations. They wanted the Company to serve as an example of how a plating business should be run.

They immediately corrected the problems leading to these discharges, upgraded their faulty pretreatment system to a state-of-the-art system

### 4. Stricker Refinishing's Systemic Changes to its Pretreatment System and Subsequent Regulatory Inspections

Stricker Refinishing completely overhauled its pretreatment system, changing the way it does business. It invested over $100,000 since August 2007 upgrading its facilities and improving its operations to insure compliance with all federal, state and NEORSD regulations, and educated themselves as to how to avoid these problems in the future. These have not been small, token gestures, but instead demonstrate a systemic change resulting in the creation of a state-of-the-art pretreatment system and a renewed commitment to doing business the right way.[14]

The Company made these changes immediately, and most of these changes were completed by early 2008, before any contact from the United States Attorney's Office. These improvements have insured that the Company has complied with all federal, state and NEORSD requirements since August 2007. The Ohio EPA and the NEORSD made multiple surprise inspections of the Company's facility and operations since August 2007, and the Company has passed each of its inspections.

---

[14] *See* Appendices A, B, C, and D.

1. *Greg and Tom's Sentencing Guidelines Calculations*

    a.    <u>Adjusted Offense Level</u>

A review of the Presentence Investigative Reports places Greg and Tom's adjusted offense levels at 13, in a Zone C. *Presentence Investigative Report of Gregory T. Stricker*, at ¶¶ 55-56; *Presentence Investigative Report of Thomas J. Stricker*, at ¶¶ 50-51.

    b.    <u>Effect of the Illegal Discharges</u>

The conduct in this case, while serious, did not involve any verifiable environmental problem. No wildlife was harmed as a result of these discharges, and the NEORSD's facilities were not damaged in any way.

2. *Greg Should Receive A Downward Departure For His Minor Role in the Offense Pursuant to U.S.S.G. § 3B1.2*

The Sentencing Guidelines provide for a downward adjustment for a mitigating role in the offense. U.S.S.G. § 3B1.2 (b) provides a 2-level downward departure when the defendant was a minor participant in the offense. The Sentencing Guidelines provide guidance on the applicability of this downward departure, noting "subsection (b) applies to a defendant described in Application Note 3(A) who is less culpable than most other participants, but whose role could not be described as minimal." *U.S.S.G. § 3B1.2*, Application Note 5.

In making this determination, the different roles that Greg and Tom play in the Company's operations must be analyzed. As seen above, Greg has been responsible for the front-end of the plating process. During the March through August, 2007 timeframe, Tom was responsible for the back-end of the plating process, including supervising the pretreatment system. He performed the daily maintenance on the wastewater treatment system, including monitoring its performance and performing basic maintenance on the WWE system in place at that time. Tom operated the system's by-pass on the three occasions identified in the Information.

Tom candidly admitted that "* * * I am more responsible for what happened than my brother Greg. The operation and supervision of the waste treatment system is one of my principal areas of responsibility." *Presentence Investigative Report of Thomas J. Stricker*, at ¶ 19. On this admission alone, this Court could conclude that the two-point downward departure is appropriate because of his greater responsibility for the discharges outlined in the Information. Coupled with the division of responsibilities outlined above, then it is readily apparent that Greg's offense level should be lowered from a 13 to an 11, in a Zone B, because of his minor role in the offense.

3. *Greg And Tom Should Receive A Downward Departure Pursuant to U.S.S.G. § 5K2.0 As The Loss Of Business And Hardship Imposed On Employees Are Permissible Considerations*

In *United States v. Holz*, 118 Fed. Appx. 928 (6th Cir. 2004), the Sixth Circuit affirmed the district court's granting of defendant's motion for downward departure under U.S.S.G. §5K2.0.[15] In *Holz*, the defendant was convicted of two counts of subscribing a false tax return, in violation of 26 U.S.C. §7206(1). In that case, the defendant's applicable sentencing range was 12-18 months, but the court sentenced defendant to 3 years probation. The court's departure was based in part on the impact defendant's incarceration would have on his business. The government objected to the court's consideration of defendant's business, arguing that the impact to the business falls under the prohibited category of socio-economic status under §5K2.0(d)(1). The Sixth Circuit disagreed, and explained that the loss of a defendant's business is a permissible consideration under the Guidelines. *Id.*, at 937, *citing United States v. Crouse*, 145 F.3d 786, 790 (6th Cir. 1998).

In *Holz*, the defendant's three employees each had relied on defendant "for guidance and training in developing their skills in the building industry, and they relied on [the defendant's company] for their jobs." *Holz*, at 938. While there existed significant family circumstances in *Holz*, the court stated, "[j]ust as the family considerations favor a departure, so too do the business impact consideration." *Id.*, at 940.

In addition to the Sixth Circuit, the First and Second Circuits "have both found the business impact is a permissible consideration in considering whether to grant a downward departure." *Holz*, at 937, *citing United States v. Olbres*, 999 F.3d 28, 36 (1st Cir. 1996); *United States v. Milikowsky*, 65 F.3d 4, 9 (2nd Cir 1995). *Milikowsky* noted that "[w]hile we agree with our sister circuits that business ownership alone, or even ownership of a vulnerable small business, does not make downward departure appropriate..., departure may be warranted where, as here, imprisonment would impose extraordinary hardship on employees." *Milikowsky*, at 9. *Olbres* relied on the United Stated Supreme Court ruling in *Koon v. United States*, 518 U.S. 81 (1986), and held "socio-economic status and job loss are not semantic or practical equivalents of each other...As *Koon* holds that job loss by the defendant resulting from his incarceration cannot be categorically excluded from consideration, we think it follows that job loss to innocent employees resulting from incarceration of a defendant may not be categorically excluded from consideration." *Olbres*, 99 F.3d at 36.

Further, in *United States v. Toback*, 2005 U.S. Dist. LEXIS 6778 (S.D.N.Y. April 19, 2005), the district court sentenced the defendant outside the Guideline range, primarily, because he was integral to the survival of his business. In *Toback*, the defendant's Guideline offense level was a 12, with a criminal history category I. The District Court reviewed the factors under 18 U.S.C. §3553(a) and found that: 1) the instant offense was defendant's first; 2) he took responsibility for his conduct, 3) he had a family to support and business to operate; 4) as the sole owner and

---

[15] Under U.S.S.G. §5K2.0, the district court may depart downward from the applicable range if, "pursuant to 18 U.S.C. §3553(b)(1), there exists an aggravating or mitigating circumstance... of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. §3553(a)(2), should result in a sentence different from that described." *See* U.S.S.G. §5K2.0(a)(1)(A).

operator of a company, he was integral to the business; 5) "[a]n abundance of letters from Toback's family, colleagues and friends speak to his outstanding and reliable character, his devotion to his family and his dedication to his business"; and 6) the fact that the defendant had otherwise led a law-abiding life. *Id.* at *11-12. Specifically, regarding his role with the company, the court explained:

> Toback is essential to the successful operation of Westerly Market. His daily guidance an input keep the business thriving; conversely, his removal would cause extraordinary hardship on those who are employed by him…Toback's devotion to Westerly Market is the source of the business's growth…Should Toback be imprisoned, a vacuum in leader-ship would result, significantly threatening the business's continued prosperity and endangering the future employment of its 80 plus employees.

*Id.*, at *14-16.

Based on these reasons, the district court found "a sentence of time served is imposed, followed by a three-year term of supervised release, ten months of which are to be served through home confinement." *Id.*, at *16. The court also ordered that "the terms of home confinement will be established to allow for the necessary monitoring at home and at work, thereby permitting Toback to continue providing for the long-term success of Westerly market and its employees. *Id.*

Here, as described above, and through the affidavit of Stricker Refinishing employee Elie Nadar, and the numerous character letters submitted on behalf of Tom and Greg, they are an integral part of Stricker Refinishing. Without their presence, the Company will lose that which keeps it operating. The Company's employees and their families, all innocent third parties, will irreparably suffer should Tom and Greg be incarcerated.

Greg and Tom play separate, yet equally vital, roles in the operation of the Company. Their employees and customers rely upon their continued presence at the facility. Their job responsibilities are outlined above, and it is clear that the Company cannot survive without their continued daily involvement. Simply put, without Greg and Tom's uninterrupted presence at the Company's facility, Stricker Refinishing will cease to exist. As Mr. Nader's affidavit relates, 13 full and part-time employees will be forced to seek work in today's challenging economic climate if the Company closes. Many of these employees do not have skill sets that translate to jobs outside of the plating industry, making their positions at Stricker Refinishing vital to their economic welfare.

### 4. *18 U.S.C. § 3553 Factors Support a Variance From a Sentence of Incarceration*

When sentencing a defendant, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes of" sentencing. That statute provides in pertinent part:

> (a) Factors to Be Considered in Imposing a Sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in

12

paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

\* \* \*

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

An analysis of 18 U.S.C. § 3553(a) readily supports a variance to a non-jail sentence. Examining the nature and circumstances of the offense and the history and characteristics pursuant to 18 U.S.C. § 3553(a)(1), it is readily apparent that these two men made a serious mistake. In many ways, Greg and Tom represent the best in our society. They are dedicated family men who have spent significant portions of their lives working to better their community. While there is no question that this is a serious offense, there is also no question that this offense will *never* be repeated.

Even a cursory application of 18 U.S.C. § (a)(2)(C)(the need to protect the public from further crimes of the defendant) suggests that a non-jail sentence would be appropriate. Society will not be any "less safe" because Greg and Tom are incarcerated. To the contrary, incarceration would deprive society of individuals who are needed in the home and at work and whose talents and generosity benefit many of those in the community that are less fortunate.

Greg and Tom are committed to living life the right way, and the legal system has many alternatives to incarceration that will insure that they stay on the right path. With a non-jail sentence, they can continue to live productive, law-abiding lives and fulfill their responsibilities as fathers, employers and citizens.

### 5. *The Company's Recommended Sentence Should be Imposed*

The Government and the Defendants in this case spent a significant amount of time fashioning an appropriate sentence for the Company. Stricker Refinishing respectfully requests that this Court accept the negotiated sentence in paragraphs 25-27 of the plea agreement and sentence the Company to a two-year term of probation, a $30,000 fine, and a $10,000 Community Service payment to Ducks Unlimited. The Company has already paid the $10,000 fine to Ducks Unlimited, one of the organizations dedicated to remedying environmental and Clean Water Act concerns.

## VIII.  Conclusion

There is no question that Greg and Tom have jeopardized everything that they have achieved in their lives to date. They have no one to blame for this situation but themselves. Still, they have taken every possible step that they could to rectify their errors and demonstrate to this Court that they are worthy of a second chance.

Greg and Tom have dedicated themselves to making sure that the Company fully complies with all federal, state and local environmental requirements. They both feel a responsibility to prove to the world that they have learned from their errors and that the family business they have worked so hard to build will be a good corporate citizen in the future. This sense of responsibility does not just extend to the bricks and mortar of the Company, but Greg and Tom care deeply for their employees who depend on Stricker Refinishing for their livelihood. They recognize that they have let these employees down, and they hope to be able to continue to provide them with a positive work environment in the future.

Since this incident occurred, Greg and Tom have demonstrated their renewed commitment to doing business the right way. Over the past three and a half years, this renewed commitment has led Stricker Refinishing to be a model of governmental compliance in its approach to meeting its regulatory obligations.

Because of their efforts, family responsibilities, acceptance of responsibility, and the devastating effect that a prison sentence will have on their business, Tom and Greg respectfully request that this Court impose a non-jail sentence and the fines suggested by the United States. The Company also respectfully requests that this Court impose the sentence recommended in paragraphs 25-27 of its plea agreement.

Respectfully submitted,


/s/ John R. Mitchell
MICHAEL L. HARDY
Ohio Bar Reg. No. 0011717
JOHN R. MITCHELL
Ohio Bar Reg. No. 0066759
Mike.Hardy@ThompsonHine.com
John.Mitchell@ThompsonHine.com
Thompson Hine, LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
(216) 566-5500

*Attorneys for Gregory T. Stricker and Stricker Refinishing Company, Inc.*

/s/ John F. McCaffrey
JOHN F. MCCAFFREY
Ohio Bar Reg. No. 0039486
jmccaffrey@mmlitigation.com
McLAUGHLIN & McCAFFREY LLP
1111 Superior Avenue
Eaton Center, Suite 1350
Cleveland, Ohio 44114-2500

*Attorney for Thomas J. Stricker*

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing *Joint Sentencing Memorandum for*

*Defendants Thomas J. Stricker, Gregory T. Stricker and Stricker Refinishing Company, Inc.*

was served by electronic filing, regular U.S. mail and email this 18th day of March, 2011, upon

the following:

> Brad J. Beeson
> Assistant United States Attorney
> Office of the United States Attorney for
> the Northern District of Ohio
> United States Courthouse
> 800 W. Superior Avenue, Suite 400
> Cleveland, Ohio 44113-1852

/s/ John R. Mitchell
*One of the Attorneys for Gregory T. Stricker*
*and Stricker Refinishing Company, Inc.*

# APPENDIX A

a.   Consultants And Contractors:  Stricker Refinishing hired **nine** different consultants and contractors to critically analyze and upgrade its operations after the events of August 2007.

1.   HzW Environmental Consultants, LLC ("HzW") was hired in September 2007 and made the following recommendations in order to insure that the Company is compliant with federal, state and NEORSD regulations:

   A.   **Establishment of Satellite Accumulation Points and 90-Day Accumulation Areas:**

   In order to increase the efficiency of hazardous waste tracking on site, HzW assisted the Company in establishing satellite accumulation areas for specific waste streams.  In addition, a 90-day waste accumulation area was clearly demarcated, and an aboveground storage tank for hazardous waste was established.  These areas were reviewed with all personnel during the annual personnel training event (see item C, below).  HzW also reviewed and updated accumulation area inspection forms completed and maintained by the Company. Stricker Refinishing invested in a new double-walled polyethylene aboveground storage tank for purposes of storing hazardous waste.  The tank is equipped with an automatic leak detection system that detects any release of a liquid to the interstitial space of the double-walled tank.  This detection system is connected to the on-site security system such that, should a release be detected, the plant alarm will be triggered and both company personnel and emergency personnel will be alerted.

   B.   **Completion of a Hazardous Waste Contingency Plan, as required for Large Quantity Generators of Hazardous Waste:**  The Hazardous Waste Contingency Plan ("Plan") was completed in accordance with Ohio Administrative Code (OAC) § 3745-65.  The Plan outlines the types of hazardous waste generated on site, and the steps to be taken in the event of a release of hazardous waste, and lists the Company personnel who have hazardous waste management responsibilities.  This Plan was transmitted to the local police department, fire department, hospital, and Ohio EPA and local emergency response team which may be requested to provide emergency services.

   C.   **Annual Personnel Training:**   Annual hazardous waste management and Contingency Plan training has been conducted for all personnel who have hazardous waste management responsibilities.   The training included identification/characterization of hazardous waste, proper handling practices, container marking, weekly/daily inspections, satellite and 90-day storage areas and proper manifesting.  Other elements of the training include proper handling of used oil and universal wastes.

D.   **Waste Characterization:** In coordination with Enviroserve of Cleveland, Ohio, HzW reviewed the waste characterization data and waste profiles for process waste streams generated on site. Where necessary, waste profiles were updated and the waste streams were summarized in the Contingency Plan. The waste characterization and profiles are maintained on site by Stricker Refinishing.

E.   **Completed a Toxic Organic Management Plan (TOMP):** HzW created a TOMP that satisfied NEORSD requirements.

F.   **Air Emissions Inventory:** Though not required, the Company insisted that HzW perform an analysis of the air quality in the facility. HzW determined that Stricker Refinishing satisfied all applicable federal and state regulations regarding its air quality and any material that the Company releases into the air.

2.   Eagle Technology ("Eagle") was hired in September 2007 to prepare a Permit to Install application for submission to the NEORSD that outlined systemic changes made to Stricker Refinishing's wastewater treatment system. The Company made the following improvements in response to Eagle's analysis:

A.   **Systemic Changes:** Two 850 gallon tanks were added (including air agitation and separate dosing pumps) for the collection of spent process solutions and rinses for controlled introduction to the existing wastewater pretreatment system. One 3150 gallon double-walled holding tank was added for the collection of spent process solutions for subsequent off-site hauling. The project also included the addition of a pH control panel in conjunction with a caustic metering pump to provide automatic pH control in the cyanide treatment tank.

B.   **Specifics of the Plan:** The adopted improvements include the acquisition of three holding tanks (described above) for the collection of spent process solutions and designated as dead rinses for the finishing operations. The cyanide treatment was also enhanced to include automated pH control. Each improvement is outlined below:

1.   The addition of one 3150 gallon double-wall polyethylene tank used for the collection of spent process solutions for hauling off-site. Solutions selected for off-site disposal include, but are not limited to, those spent process solutions and dead rinses considered to have a potentially adverse impact on the existing treatment system.
     Tanks 133 and 170 are now cyanide bearing and noted with (CN) after the tank number. They are now treated via alkaline chlorination to oxidize the cyanide into cyanate prior to transfer to the 3150 gallon tank. The following treatment process are now performed in a dedicated tank:

     A.   pH adjustment to >10.5 via NaOH addition;

B.       Sodium Hypochlorite (NaOCl) addition to positive KI test paper;

C.       Re-check for Cl residual with KI test paper after 40 minutes (additional NaOCl will be added as required);

D.       Solution pH will be checked with hand held pH meter or pH test strips to ensure it is maintained >10.5.

Treated solution from tanks 133 and 170 is now transferred to the 3150 gallon double wall tank until it is positively determined the cyanide treatment process described above is complete. Tank 112 is for the collection of brass and copper sludges and, the (S) designates that it is hauled off-site for proper treatment. Brass and copper sludges do not enter the collection tanks or treatment system.

2.  Two 850 gallon polyethylene tanks were added for the collection of process rinse water. The 850 gallon tanks now allow for the controlled introduction of process rinse water to the existing treatment system. Tank A collects those rinses known to be free of regulated metals, and the collected solution is routed to the final pH adjustment tank. Tank B collects those rinses that contain regulated metals. The rinses from Tank B are now routed to the head of the existing treatment system for metals removal via ion exchange. Tanks A and B employ an adjustable ¼" air diaphragm pumps P-5 and P-6, respectively, for modes of introduction. The rates of addition are carefully regulated so as not to create a spike to the system. An automatic acid feed system was added to the pre-treatment system for situations in which the high pH alarm in tank T-7 is activated. Tank A and Tank B's flow are regulated:

Samples from dead rinse tanks, as well as process tanks, were taken at the end of the solution life of each process to reflect worse case scenarios. Additional outside testing was performed to insure the above tank routing will not adversely impact the treatment system.

In-house testing of the treated effluent is also performed to make certain the Company is in compliance with the discharge limits. Samples are also sent to Siemens Water Technologies (Siemens) for testing and verifying accuracy of Stricker Refinishing's testing.

There are now eight (8) counter-flow rinses and one (1) single rinse (flowing rinses) routed to the existing pretreatment system.

3. An automated caustic feed system was installed in the cyanide treatment tank to ensure a proper pH is maintained. The system consists of a dedicated pH controller and a caustic metering pump. The pH controller is housed in the existing control panel and has audio/visual alarms to alert company personnel of improper levels of pH in the treatment tank.

C. **Improved System Monitoring:** The Company purchased additional test equipment to perform in-house effluent testing of target metals. It is currently using on a routine basis, a Hach DR/890 spectrophotometer to monitor the quality of their final effluent being discharged to the city sewer. This instrument will also be useful in determining the effectiveness of the three ion exchange metals removal system. The Hach DR/890 is capable of analyzing nickel, copper, zinc, cyanide, and chlorine. The in-house testing is verified quarterly by Siemens Water Technologies Corporation to ensure testing accuracy.
In addition to the in-house testing described above, Stricker Refinishing performs regular carbamate drop testing and KI test paper testing to ensure proper treatment is being maintained.

These plans were submitted as a request for a permit to install in March 2008 and approved by the NEORSD on May 21, 2008. The Ohio EPA approved the permit to install on July 31, 2008. The changes called for in the plan prepared by Eagle have been implemented to improve overall water quality and, as a result, no discharge is directly entering NEORSD sewers without undergoing rigorous pre-treatment.

3. Environmental and Emergency Services ("EES") was hired in September 2007 to complete hazardous waste, chemical inventory, locator list, and any other reporting requirements for the NEORSD and Ohio EPA.

4. Enviroserve was hired in September, 2007 to determine the proper shipment and disposal of hazardous and nonhazardous waste under the applicable waste regulations. After that determination, Enviroserve began servicing the Company with regard to its waste disposal. Specifically, Enviroserve removes the following types of waste:

A. **Liquid Waste Materials:** Materials that cannot be treated internally in Stricker Refinishing's new wastewater treatment system are stored in the 3150 gallon tank until collected by Enviroserve.

B. **Solid Waste Materials:** Used filter cartridges, tank liners, filter sacs and other items.

Enviroserve has been hired to properly dispose of this waste off-site.

5. Water and Wastewater Laboratories ("WWL") has performed monthly sampling for the Company. In September 2007, its responsibilities were broadened to include analyzing samples of all processed waste to determine the proper manner in which they should be

regulated—hazardous or nonhazardous. WWL sampled Stricker Refinishing's waste from September, 2007 through January, 2008, including:

A.  Sampled all aspects of the pre-treatment system to determine what could be processed through the system and what had to be disposed of through other means. WWL determined whether or not the rinses from the batch treatments and dead rinses could be incorporated into the pre-treatment system. This sampling was important in determining how the pre-treatment system would be changed, items to be added to the system, and whether outside consultants would be needed to dispose of liquid and other waste;

B.  Performed required monthly discharge analysis of waste water sampled from final tank in pre-treatment system;

C.  Prepared semi-annual reports for NEORSD after sampling the final tank in the wastewater treatment system; and

D.  Tested the process tanks after the pre-treatment system was overhauled to insure waste water levels were in compliance with NEORSD and Ohio EPA requirements.

6.  Water Treatment Consultants, Inc. (WTC) was retained in February, 2008 to inspect and certify double wall tank and sensors. WTC sent a professional engineer to inspect the newly installed 3150 gallon tank to insure that it complied with OAC § 3725-66-92. This engineer also tested and verified that the tank's internal alarm system was working properly.

7.  Siemens Water Technologies ("Siemens") replaced Water and Wastewater Equipment ("WWE"). WWE designed and installed the original pre-treatment system referenced above. The Company encountered numerous problems during the installation and early operation of that system, and hired Siemens to assist WWE in making operate correctly. After the installation, the company discharged WWE and continued using Siemens. Siemens played a prominent role as the company upgraded its systems after August, 2007, including:

A.  Assisting Stricker Refinishing in upgrading the equipment and the methods used to perform its internal analysis of its wastewater;

B.  Instructing the Company in the most efficient use of its carbon and three ion exchange tanks that are compatible with the wastewater treatment system. With Siemens' help, these carbon and ion exchange tanks now last longer and have increased the efficiency of the wastewater treatment system;

C.  Determining that the Company needed additional filters to increase efficiency of its wastewater treatment system. Two filters were added to the waste treatment system to remove slime and oil prior to the water going through the filter socks

and carbon and ion exchange tanks. The wastewater system now has four (4) filters;

D.     Independently verifying Stricker Refinishing's wastewater samples to insure metal levels are in the allowable range; and

E.     Recommended using dead rinses for regulated materials coming out of the process bath prior to introduction into the pre-treatment system. This additional step prevents the wastewater system from spiking and increases the life of the ion exchange tanks.

8. Environmental Monitoring Systems, Inc. ("EMS"):   EMS upgraded the Company's electrical and plumbing systems and worked with the company to eliminate problems with that arose during the system's installation.   EMS presently performs weekly maintenance on all probes and anything affiliated with the wastewater pre-treatment system.

9. Diversified Air:   Diversified Air has been hired to perform quarterly preventative maintenance on the two air compressors and the dryer that run the waste treatment system.

# APPENDIX B

b.  <u>System Improvements</u>:  As a result of these upgrades, **there is no direct discharge of any wastewater into the storm sewer**.  All materials are either pre-treated or hauled off-site by a qualified contractor.  The following chart demonstrates the steps Stricker Refinishing has taken to refine its operations to insure compliance with federal, state and NEORSD regulations:

1.  **NEORSD Mandated Improvements:**  In August 2007, the NEORSD required the Company to make several improvements to the property.  These improvements have been made, including:

    A.  **Removed the by-pass valve:**  Before, materials that exited the system through the by-pass valve (during its infrequent use) were not properly treated.  Now, all materials must go through the NEORSD approved wastewater treatment system prior to exiting the premises.

    B.  **Closed drain and blocked back sewer:**  This improvement prevents the unauthorized discharge of any materials from the Company's premises.

    C.  **Diked existing sewer to keep out floor water out of sewer:**  The Company diked an internal sewer to prevent water spilled inside the Company's facilities from being discharged into sewer system.

    D.  **Diked the rear door:**  The Company diked the area near the rear door to prevent the unauthorized discharge of materials into a back alley behind the facility.

2.  **Wastewater System Equipment Improvements:**  As a result of working with the consultants and contractors, Stricker Refinishing incorporated the following equipment upgrades into the wastewater system.

    A.  **Added Eight (8) Counter-flow Rinse Tanks:** Installed cascading (counter-flow) rinses to the Zincate, Copper, Alkaline, Acid (2), Nickel, Bright tin, and Dull tin plating line rinse tanks.  As a result, rinses remained cleaner and no additional water change required.

    B.  **Two 850 Gallon Holding Tanks with Mixers and Pumps Added:**  Instead of batch treating, these holding tanks are used to hold the processed water until it can be properly cycled through the company's wastewater treatment system.  These two tanks are gradually introduced into the wastewater treatment system.

    C.  **3150 gallon, Double-walled Waste Holding Tank Added:**  This tank holds hazardous waste that cannot be processed by the wastewater system.  It is held in the tank until it is picked up for off-site disposal by Enviroserve.  Accidental

discharge is impossible as the tank does not have a discharge valve, and the tank is equipped with a sensor and alarm in the event of a leak.

D.   **New Panel for Caustic Feed on Waste Treatment Added:**  As part of the upgrades to the wastewater treatment system, the company installed caustic feed pump on waste treatment cyanide treatment tank. This feed pump is equipped with a pH control panel to provide automatic pH control in the cyanide treatment tank.

E.   **Plumbing for Hazardous Waste System:**  Contractors updated wastewater treatment system's plumbing to insure that wastewater pre-treatment system requirements are being met.

F.   **Pumps and Probes for Waste Treatment:**  New Berrington pumps were installed to insure that the upgraded pre-treatment system ran smoothly. The Company installed a larger pump for bleach on waste treatment cyanide treatment tank. Two additional filters were added to the waste treatment system to remove slime and oil before going through filter socks and carbon and ion exchange tanks. The system now has four filters.

G.   **Six Totes (Holding Tanks) Purchased:**  Six holding tanks were purchased to hold solutions and adjust cyanide levels as needed.

I.   **Air Compressor and Dryer to Run Waste Treatment System:**  The air compressor that powers the wastewater system is now on a regular maintenance schedule to insure its proper performance. A back-up compressor was also installed.

J.   **Improved Electrical for Hazardous Waste System:**  Contractors rewired the electrical components of the wastewater system it insure that the system will have an electrical failure.

K.   **Gold Reclamation System installed:**  The new gold reclamation system recovers regulated metals prior to any processed water entering the waste treatment system, reducing the overall amount of regulated metals entering the system.

L.   **Silver Reclamation System Reconfigured:**  The silver reclamation system recovers regulated metals prior to any processed water entering the waste treatment system, reducing the overall amount of regulated metals entering the system.

M.   **Added Cascading (counter-flow) Rinses Prior to the Electroless Nickel Baths:**  These baths are lasting about two times longer as the cascading rinses eliminate drag out from previous tanks that is carried into the nickel baths.

N.    **Added Third Ion Exchange Tank:**  The third ion exchange tank was added to the wastewater treatment system to increase its efficiency, insuring that all regulated metals are analyzed and that the system is operating within its limits.

O.    **Added Spill Pallets**:  These pallets reduce the overall amount of rinse waters that can spill on to the floor.  Now, water that is spilled is contained by the spill pallets and then pumped directly into the 3150 gallon hazardous waste containment tank.

P.    **Added Three Cartridge Filters:**  Added three cartridge filters (in-line) for hazardous waste system that trap grease and oil prior to entry into the ion exchange tanks and remove particulates after ion exchange tanks.

Q.    **Purchased New Pressure Gauges:**  these new gauges help determine when the ion exchange filters are spent.

R.    **New Panel for Acid Feed:**  As part of the upgrades to the wastewater treatment system, the company installed an acid feed pump on the waste treatment final pH tank.

# APPENDIX C

c.  Process Improvements:  Stricker Refinishing made the following process improvements after working with their consultants and engineers:

1.  **Using Nickel Dead Rinses as Make-up water:**  Upon recommendation of the Company's new electroless nickel supplier (MacDermid), Stricker Refinishing began using the water from electroless nickel dead rinses as make-up water in January 2008. The Company no longer changes electroless nickel dead rinses, and the cascading nickel rinse stays clean and the need to change nickel hot water has been reduced significantly.

2.  **Using Copper Dead Rinses as Make-up water:**  Upon recommendation of the Company's copper supplier (Broco), Stricker Refinishing began using the water from the copper dead rinses as make-up water in January 2008.  As a result, the dead copper rinse stays cleaner longer and the need to change copper dead rinse has been significantly reduced.

3.  **Performing Wastewater Testing On-site:**  Stricker Refinishing is doing its own on-site testing with a Hach Colorimeter (with independent verification from Siemens).

4.  **Annual Training for its Employees:**  Training includes identification/characterization of hazardous waste, proper handling practices, container marking, weekly/daily inspections, satellite and 90-day storage areas and proper manifesting.

5.  **Hazardous Waste Contingency Plan**: the plan was completed and outlines the types of hazardous waste generated on site.  It also dictates the steps to be taken in the event of a release of hazardous waste, lists Stricker Refinishing personnel who have hazardous waste management responsibilities, and identifies contact information of emergency personnel.

# APPENDIX D

d.   <u>Education</u>:   In addition to the training for its employees, Greg and Tom attended numerous seminars to educate themselves regarding all applicable environmental regulations.

  1.  Greg completed the following courses:

      A.   *What to Expect During a Hazardous Waste Inspection RCRA Introduction or Refresher* class presented by the Northeast Ohio Regulatory Compliance Seminars Committee: NEORSD, Ohio Association of Metal Finishers, Ohio EPA, and the Cleveland Clean Air Century Campaign. Topics presented in the seminar include hazardous waste identification, hazardous waste management requirements, Used Oil, Universal wastes, and record keeping requirements. Speakers provided a step by step description of a hazardous waste inspection done by an Ohio EPA inspector.

      B.   *Regulatory Compliance Seminar* offered by the Ohio EPA. Ohio EPA Course Approval Numbers Licensed Waste Water Operator: OEPA-B298395-X Both (DW & WW) and OEPA-S463511-OM WW. It was sponsored by the American Lung Association Clean Air Century Campaign, NEORSD, Ohio Association of Metal Finishers and the Office of Compliance Assistance and Pollution Prevention of Ohio EPA (OCAPP). It was presented by representatives of the City of Cleveland, Division of Fire, Cleveland Department of Health-Division of Air Quality (CDAQ), NEORSD, Ohio EPA, US Department of Labor Occupational Safety & Health Administration (OSHA), USEPA Criminal Investigation Division (USEPA CID). The seminar provided important information regarding maintaining compliance with environmental, health and safety regulations.

      C.   *Regulatory Compliance Seminar* offered by the Ohio EPA. Ohio EPA Course approved Number Licensed Waste Water Operator: OEPA-S471152-OM (WW).

      D.   Hazardous Waste Management Training instructed by HzW Environmental Consultants, LLC.

  2.  Tom completed the following courses:

      A.   *What to Expect During a Hazardous Waste Inspection RCRA Introduction or Refresher* class presented by the Northeast Ohio Regulatory Compliance Seminars Committee: NEORSD, Ohio Association of Metal Finishers, Ohio EPA, and the Cleveland Clean Air Century Campaign. Topics presented in the seminar include hazardous waste identification, hazardous waste management requirements, Used Oil, Universal wastes, and record keeping requirements.

Speakers provided a step by step description of a hazardous waste inspection done by an Ohio EPA inspector.

B.  *Treatment of Metal Wastestreams* class offered by the California State University, Sacramento sponsored by NEORSD.

C.  Hazardous Waste Management Training instructed by HzW Environmental Consultants, LLC.

D.  "Spills 101 For Facilities: Prevent, Recognize, Respond & Report." Conducted by Cuyahoga County Local Emergency Planning Committee (LEPC).